JUDGE OETKEN

15 CV 02061

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

AMERICAN CIVIL LIBERTIES UNION;
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION,

           Plaintiffs,

v.

TRANSPORTATION SECURITY
ADMINISTRATION,

           Defendant.

**COMPLAINT FOR
INJUNCTIVE RELIEF**

Civil Action No.

RECEIVED
MAR 19 2015
U.S.D.C. S.D. N.Y.
CASHIERS

## Introduction

1.    This Freedom of Information Act lawsuit seeks the release from the Transportation Security Administration ("TSA") of records concerning its "behavior detection" programs, including the Screening Passengers by Observation Techniques ("SPOT") program—a program that government auditors, members of Congress, and independent experts have criticized as discriminatory, ineffective, pseudo-scientific, and wasteful of taxpayer money. The approximately 1.8 million travelers passing through our nation's airports every day—including people traveling for business, students going home for the holidays, and families on their way to vacation—are potentially subjected to this highly questionable program, in addition to now-routine security procedures that include producing identification, passing through imaging machines, and allowing x-ray screening of carry-on items. Although the TSA has been using behavior detection techniques in some form since 2003, there is no known instance in which these techniques were responsible for apprehending someone who posed a security threat.

1

2. According to the TSA, "behavior detection" techniques can be used to observe the behavior of passengers in an attempt to identify individuals who may pose a potential transportation security risk. The TSA trains and deploys "behavior detection officers," who observe individual passengers in airport screening areas for specific behaviors that the TSA associates with stress, fear, or deception. When the officers perceive clusters of such behaviors in an individual, they refer that person for secondary inspection and questioning. During the secondary inspection process, if the officers perceive certain additional behaviors, they can refer the individual to law enforcement officers for further questioning, detention, and possibly arrest. Passengers, as well as behavior detection officers themselves, have complained that this process results in subjecting people of Middle Eastern descent or appearance, African Americans, Hispanics, and other minorities to additional questioning and screening solely on the basis of their race.

3. Internal government auditors, members of Congress, and independent experts have criticized the TSA's behavior detection programs as ineffective, wasteful of taxpayer funds, and lacking a valid scientific basis. Auditors have also found that the TSA failed to assess the effectiveness of the SPOT program or implement a comprehensive training plan for behavior detection officers. The TSA has spent over $1 billion on the SPOT program since 2007.

4. Additional information pertaining to the TSA's use of behavior detection techniques is vital to the public's understanding of whether the TSA can effectively use such techniques to screen for threats to aviation security, whether behavior detection programs can be implemented at all without incurring an unacceptable risk of unlawful

2

profiling, and whether the TSA has put in place mechanisms to monitor and eliminate biased and unlawful profiling.

5. On October 1, 2014, Plaintiffs American Civil Liberties Union and American Civil Liberties Union Foundation (together, "ACLU") submitted a Freedom of Information Act ("FOIA") request ("Request") to the TSA seeking the release of records related to behavior detection programs, including any scientific basis for the programs, the policies governing them, the training and professionalism of those who implement them, their efficacy, and the extent to which they disproportionately impact minorities. The TSA has not produced the requested records. Plaintiffs now file suit under FOIA, 5 U.S.C. § 552, for injunctive and other appropriate relief.

6. The public interest in the release of these documents is manifest, but the TSA has refused Plaintiffs' requests for expedited processing and a waiver of processing fees. Plaintiffs are entitled to immediate processing of the Request and timely release of the records.

## Jurisdiction and Venue

7. This Court has subject matter jurisdiction over the FOIA claim and personal jurisdiction over the parties pursuant to 5 U.S.C. § 552(a)(4)(B) and 5 U.S.C. § 552(a)(4)(A)(vii). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 701-06. Venue is proper in this district under 5 U.S.C. § 552(a)(4)(B).

## Parties

8. The American Civil Liberties Union is a nationwide, non-profit, non-partisan organization with over 500,000 members dedicated to the constitutional principles of

liberty and equality. The ACLU is committed to ensuring that the U.S. Government complies with the Constitution and laws, including its international treaty obligations, in matters that affect civil liberties and human rights. The ACLU is also committed to principles of transparency and accountability in government, and seeks to ensure that the American public is informed about the conduct of its government in civil liberties and human rights matters.

9. The American Civil Liberties Union Foundation ("ACLUF") is a separate 501(c)(3) organization that educates the public about civil liberties and employs lawyers who provide legal representation free of charge in cases involving civil liberties.

10. Defendant the TSA is a component of the Department of Homeland Security ("DHS"), a department of the Executive Branch of the United States Government. The TSA is an agency within the meaning of 5 U.S.C. § 552(f)(1).

## Factual Background

11. The TSA has used what it describes as behavior detection techniques to screen passengers for flights at U.S. airports since 2003. SPOT, the TSA's primary behavior detection program, began in 2007. However, the public knows little about the scope, effectiveness, or purported scientific basis for these programs.

12. Government auditors have repeatedly questioned the basic premise underlying the TSA's behavior detection programs: that human behaviors reflecting deception or ill-intent can be detected reliably and objectively.

13. The Government Accountability Office ("GAO") concluded in May 2010 that the "TSA deployed SPOT nationwide before first determining whether there was a scientifically valid basis for using behavior detection and appearance indicators as a

4

means for reliably identifying passengers as potential threats in airports." GAO, *Efforts to Validate TSA's Passenger Screening Behavior Detection Program Underway, but Opportunities Exist to Strengthen Validation and Address Operational Challenges*, GAO-10-763 (May 2010), at 14.

14.     The DHS Inspector General's Office made similarly critical findings regarding the SPOT program in May 2013, when it determined that the "TSA cannot ensure that passengers at United States airports are screened objectively, show that the program is cost-effective, or reasonably justify the program's expansion." DHS Office of Inspector General, *Transportation Security Administration's Screening of Passengers by Observation Techniques*, OIG-13-91 (May 2013), at 1.

15.     The Government Accountability Office reexamined the SPOT program in November 2013 and found that "available evidence does not support whether behavioral indicators can be used to identify aviation security threats." GAO, *TSA Should Limit Future Funding for Behavior Detection Activities*, GAO-14-159 (Nov. 2013), at 15. Behavior detection officers reported to the GAO that some of the indicators they were instructed to detect are subjective, and the GAO determined that rates of referral of passengers for additional screening varied significantly between airports, issues which, according to the GAO, "raise questions about the continued use of behavior indicators for detecting passengers who might pose a risk to aviation security." *Id.* at 47.

16.     The government audits of the TSA's behavior detection programs generated widespread media interest. *See, e.g.*, John Tierney, *At Airports, a Misplaced Faith in Body Language*, N.Y. Times, Mar. 23, 2014, http://nyti.ms/1h24e3g; Scott McCartney, *Subtle Signs That May Mark You an Airport Security Risk*, Wall St. J., Jan. 22, 2014,

http://on.wsj.com/1FLF5UH; Alison Grant, *TSA Behavior Detection Officers' Ability to Detect Bad Actors Little Better Than Chance, GAO Study Says*, Cleveland Plain Dealer, Nov. 25, 2013, http://bit.ly/1AfPODf; Aaron Cooper, *TSA Defends Behavior Detection Program*, CNN.com, Nov. 14, 2013, http://cnn.it/NLCog0; Mark Johanson, *TSA Behavioral Detection Officers 'Not Effective,' Waste of $200M Annually: Report*, Int'l Bus. Times, Nov. 14, 2013, http://bit.ly/1Aj3o7G; Bart Jansen, *GAO: TSA's Behavior Detection Program Flawed*, USA Today, Nov. 13, 2013, http://usat.ly/1EA2P0X; Stephen Dinan, *TSA Wasting Money by Profiling Passengers' Behavior, Investigators Say*, Wash. Times, Nov. 13, 2013, http://bit.ly/18cg9dJ; Mike Ahlers and Rene Marsh, *Government Report Slams TSA Program to Spot Possible Terrorists*, CNN.com, Nov. 13, 2013, http://cnn.it/1GFr2DL; Nate Anderson, *TSA's Got 94 Signs to ID Terrorists, But They're Unproven by Science*, Ars Technica, Nov. 13, 2013, http://bit.ly/1HDq60h; Alex Davies, *Government Report: The TSA's Behavior Detection Program Is An Unscientific Waste of Money*, Bus. Insider, Nov. 14, 2013, http://read.bi/18cgwoQ; Bart Jansen, *Auditor: TSA Can't Justify Costs of Screening Behavior*, USA Today, June 5, 2013, http://usat.ly/1B53j7M.

17. The audits also prompted congressional hearings on the SPOT program, during which members of Congress and expert witnesses questioned the basic premise and effectiveness of the program. *See TSA's SPOT Program and Initial Lessons From the LAX Shooting: Hearing on Homeland Sec. Before the H. Subcomm. on Transp. Sec.*, 113th Cong. 4 (2013) (statement of Richard Hudson, Chairman, H. Subcomm. on Transp. Sec.) ("To my knowledge, there has not been a single instance where a behavior detection officer has referred someone to a law enforcement officer and that individual turned out

to be a terrorist."); (statement of Michael McCaul, Chairman, H. Comm. Homeland Sec.) ("I am concerned that TSA will continue to spin its wheels with this program instead of developing a more effective and efficient approach."). *See also Behavioral Science and Security: Evaluating TSA's SPOT Program: Hearing Before the Subcomm. on Invest. & Oversight, H. Comm. on Science, Space, and Tech*, 112th Cong. 71 (2011) (statement of Maria Hartwig, Associate Professor, Department of Psychology, John Jay College of Criminal Justice) ("In brief, the accumulated body of scientific work on behavioral cues to deception does not provide support for the premise of the SPOT program.").

18.  The TSA's use of behavior detection techniques has given rise to numerous allegations of racial and religious profiling. Such allegations have come not only from passengers, but also from behavior detection officers themselves, who have reported witnessing other officers subjecting people of Middle Eastern descent or appearance, African Americans, Hispanics, and other minorities to additional questioning and screening solely on the basis of their race. *See* Michael S. Schmidt and Eric Lichtblau, *Racial Profiling Rife at Airport, U.S. Officers Say*, N.Y. Times, Aug. 11, 2012, http://nyti.ms/1GsuvBV. In August 2012, 32 behavior detection officers alleged that such profiling was rampant at Boston Logan International Airport. *Id.* Similar allegations have been leveled at behavior detection officers working at Newark Liberty International Airport and Honolulu International Airport. *See TSA Should Limit Future Funding*, GAO-14-159 at 57.

19.  As with the government audits of the SPOT program, the allegations of racial and religious profiling generated significant media attention. *See, e.g.*, Katie Johnston, *Racial Profiling Controversy Still Roiling Logan*, Boston Globe, Nov. 15,

2013, http://bit.ly/1MsqDmB; Bart Jansen, *TSA Defends Behavior Screening Against Profiling Claims*, USA Today, Nov. 14, 2013, http://usat.ly/1E6z9mS; Steve Strunsky, *Report Criticizes TSA Behavior Program Linked to Racial Profiling*, The Star-Ledger, June 5, 2013, http://bit.ly/1EZc4GB; Aaron Cooper, Jon Noah & Kristina Sgueglia, *TSA Behavior Detection Officers Will be Retrained After Profiling Complaints*, CNN.com, Aug. 23, 2012, http://bit.ly/1AkVDhQ; Jessie Wright-Mendoza, *TSA Retraining Officers in Newark, Elsewhere Following Reports of Racial Profiling*, N.J. Pub. Radio, Aug. 22, 2012, http://bit.ly/1Bs2VFn; *TSA to investigate racial profiling claims*, CNN.com, Aug. 14, 2012, http://bit.ly/1AkVDhQ; *Latinos Face Racial Profiling at Boston Airport, TSA Officials Say*, FoxNews Latino, Aug. 13, 2012, http://bit.ly/1D74Cdt; *Report: Racial Profiling Rampant In TSA's Logan Airport 'Behavior Detection' Program*, CBS Boston, Aug. 12, 2012, http://cbsloc.al/1HECjlu; Michael S. Schmidt and Eric Lichtblau, *Racial Profiling Rife at Airport, U.S. Officers Say*, N.Y. Times, Aug. 11, 2012, http://nyti.ms/1GsuvBV; Jennifer Sinco Kelleher, *Allegations of Racial Profiling Under Investigation at Airport in Honolulu*, The Maui News, Dec. 3, 2011, http://bit.ly/1B5JFIY.

20.     The TSA has investigated allegations of unlawful profiling related to behavior detection, including allegations leveled by TSA personnel, but it has not made public the results and consequences of those investigations.

### The ACLU's FOIA Request

21.     On October 1, 2014, the ACLU submitted a FOIA request to the TSA seeking the release of records concerning the scientific basis for the TSA's behavior detection programs; policies, procedures, and guidance pertaining to the programs and their

8

implementation; training and course materials for employees involved in behavior detection activities; records concerning the analysis or assessment of behavior detection programs and their implementation; data regarding referrals for additional screening and subsequent arrests; records related to the SPOT database; records concerning investigations of, or disciplinary actions related to, the work of behavior detection officers; and records related to allegations of racial, ethnic, religious, or national origin profiling related to behavior detection activities.

22. Plaintiffs sought expedited processing of the Request on the grounds that there is a "compelling need" for the records because they are urgently needed by an organization "primarily engaged in disseminating information" in order to "inform the public about actual or alleged federal government activity."

23. Plaintiffs sought a waiver of document search, review, and duplication fees on the grounds that disclosure of the requested records is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not in the ACLU's commercial interest. The ACLU also sought a waiver of fees because it qualifies as a representative of the news media, and the records are not sought for commercial use.

**Agency Response and Appeal**

24. By letter dated October 10, 2014, the TSA denied the ACLU's request for expedited processing and a waiver of fees. The letter stated that the ACLU had "failed to demonstrate a particular urgency to inform the public about the government activity involved in the request." The letter offered no specific reason for denying the fee waiver

request, other than to state that the plaintiffs had "failed to satisfy each of the required factors."

25. By letter dated December 8, 2014, the ACLU administratively appealed the TSA's denial of their requests for expedited processing and a waiver of fees. The TSA has not provided the ACLU with a determination of its administrative appeal within the statutorily required time period. The ACLU therefore has exhausted its administrative remedies.

26. To date, the TSA has not disclosed any record in response to the ACLU's Request nor stated which records, if any, it intends to disclose.

27. The TSA is improperly withholding the records sought in the ACLU's Request.

### Plaintiffs' Entitlement to Expedited Processing

28. Plaintiffs are entitled to expedited processing of their Request.

29. The FOIA provides that each agency shall provide for expedited processing of FOIA requests where the requester demonstrates "a compelling need" for the information. 5 U.S.C. § 552(a)(6)(E)(i)(I).

30. Under the FOIA and corresponding regulations promulgated by DHS, there is a "compelling need" for expedited processing where the records at issue are urgently needed by an organization "primarily engaged in disseminating information" in order to "inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(ii); 6 C.F.R. § 5.5(d)(1)(ii).

31. Plaintiffs' Request addresses a matter of urgent public concern; namely, the scope and implementation of the TSA's behavior detection programs, which implicate

core discrimination and privacy concerns, but about which the public knows little. The public lacks information about the basis for the programs, the training and professionalism of those who implement them, their efficacy, and the extent to which they disproportionately impact minorities. Such information is of significant and urgent value to millions of Americans who travel by air each year. Without disclosure of the records sought, members of the public will not be able to assess for themselves whether the programs are necessary, effective, or subject to sufficient limits and oversight.

32.     The ACLU is "primarily engaged in disseminating information" to the public within the meaning of the statute and regulations. 5 U.S.C. § 552(a)(6)(E)(v)(II); 6 C.F.R. § 5.5(d)(1)(ii). Dissemination of information to the public is a critical and substantial component of the ACLU's mission and work. As the leading defender of freedom, equality, privacy, and due process rights in the United States, the ACLU has sought information and educated the public about various government security practices utilized and expanded since the 9/11 terrorist attacks. The ACLU publishes newsletters, news briefings, right-to-know handbooks, and other materials that are disseminated to the public. These materials—including materials based on information obtained through the FOIA—are widely available to everyone, including tax-exempt organizations, not-for-profit groups, law students, and faculty for no cost or for a nominal fee through its public education department. The ACLU also disseminates information through its website, www.aclu.org, and through an electronic newsletter, which is distributed to subscribers by e-mail. In addition to the national ACLU offices, there are 53 ACLU affiliate and national chapter offices located throughout the United States and Puerto Rico. These

11

offices further disseminate ACLU material to local residents, schools, and organizations through a variety of means, including their own websites, publications, and newsletters.

33.     The ACLU has also been a primary disseminator of information about government surveillance, security policies, and travel-related security screening measures. For example, based on documents it obtained through the FOIA, the ACLU has published reports, analyses, and explanatory materials on issues related to targeted killing, the use of drones, torture and interrogation practices, FBI surveillance and intelligence-gathering activities, the use of National Security Letters, and the National Security Agency's warrantless surveillance activity, among others.

34.     The ACLU will likewise disseminate any information obtained through this Request to the public through the publications and channels described above.

### Plaintiffs' Entitlement to a Waiver or Limitation of Processing Fees

35.     The ACLU is entitled to a waiver of document search, review, and duplication fees because disclosure is "likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii); *see also* 6 C.F.R. § 5.11(k)(1)(i)-(ii).

36.     As alleged above, numerous news accounts reflect the considerable public interest in the records Plaintiffs seek. Given the dearth of public information about the TSA's behavior detection programs, the intense news and congressional interest in what little information that has been made public, the sharp criticism of the SPOT program by the Government Accountability Office, and the fact that allegations of racial and religious profiling have arisen repeatedly in connection with the SPOT program, the records

sought in the Request will significantly contribute to public understanding of the TSA's behavior detection activities.

37. Disclosure is not in the ACLU's commercial interest. As described above, any information disclosed by the ACLU as a result of the Request will be available to the public at no cost.

38. The ACLU is also entitled to a waiver of fees because it qualifies as a "representative of the news media," and the records are not sought for commercial use. *See* 5 U.S.C. § 552(a)(4)(A)(ii)(II); 6 C.F.R. § 5.11(d)(1).

39. The ACLU is a representative of the news media for the purposes of FOIA because it is an entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn raw materials into a distinct work, and distributes that work to an audience.

40. Plaintiffs do not seek the requested information for commercial reasons. The ACLU summarizes, explains, and disseminates the information it gathers through FOIA at no cost to the public.

## Causes of Action

41. Defendant's failure to make a reasonable effort to search for records responsive to the Plaintiffs' Request violates the FOIA, 5 U.S.C. § 552(a)(3)(C), and the corresponding DHS regulations.

42. Defendant's failure to promptly make available the records sought in the Request violates the FOIA, 5 U.S.C. § 552(a)(3)(A) and 5 U.S.C. § 552(a)(6)(A), and the corresponding DHS regulations.

43.     Defendant's failure to grant Plaintiffs' request for expedited processing violates the FOIA, 5 U.S.C. § 552(a)(6)(E), and the corresponding DHS regulations.

44.     Defendant's failure to grant Plaintiffs' request for a waiver of search, review, and duplication fees violates the FOIA, 5 U.S.C. § 552(a)(4)(A)(iii), and the corresponding DHS regulations.

## Requested Relief

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Order the TSA immediately to process and release all the requested records;
2. Enjoin the TSA from charging Plaintiffs search, review, or duplication fees for the processing of the Request;
3. Award Plaintiffs their costs and reasonable attorneys' fees incurred in this action; and
4. Grant such other relief as the Court may deem just and proper.

March 19, 2015

Respectfully submitted,

*Hina Shamsi*
Hina Shamsi
hshamsi@aclu.org
Hugh Handeyside (*pro hac vice* pending)
hhandeyside@aclu.org
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004
Phone: 212-549-2500
Fax: 212-549-2629

Mariko Hirose
mhirose@nyclu.org
Christopher T. Dunn
cdunn@nyclu.org
New York Civil Liberties Union Foundation
125 Broad Street, 19th floor
New York, New York 10004
Phone: 212-607-3300
Fax: 212-607-3318